IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LEANN SANDRA LEWIS, | CASE NO. 5:24-cv-2009 |
| Plaintiff, | |
| | DISTRICT JUDGE |
| vs. | JOHN R. ADAMS |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Leann Lewis filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In February 2022, Lewis filed an application for disability insurance benefits alleging a disability onset date of January 1, 2022,[1] and claiming she was disabled due to fibromyalgia, lupus, attention-deficit hyperactivity

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

disorder (ADHD), Raynaud's disease, inflammatory arthritis, and carpal tunnel syndrome. Tr. 167, 193. The Social Security Administration denied Lewis's application and her motion for reconsideration. Tr. 61, 70. Lewis then requested a hearing before an Administrative Law Judge (ALJ). Tr. 97.

In October 2023, an ALJ held a hearing. Lewis and a vocational expert testified. Tr. 32–60. The next month, the ALJ issued a written decision finding that Lewis was not disabled. Tr. 17–27. The ALJ's decision became final on October 3, 2024, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Lewis filed this action on November 18, 2024. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ erred when he failed to support his conclusion or discuss consistency when he evaluated the opinion of the treating source.
>
> 2. At Step Four of the Sequential Evaluation, the ALJ's finding that Plaintiff could perform her past relevant work as a Department Manager was not supported by substantial evidence.
>
> 3. The ALJ erred at Step Two of the Sequential Evaluation when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all Plaintiff's impairments and related limitations when forming the residual functional capacity evaluation.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Lewis was 53 years old on her alleged disability onset date. Tr. 167. She graduated from high school and used to work as department manager at a factory. Tr. 53, 194.

*Relevant medical evidence*

In April 2021, Lewis had cervical and lumbosacral spine x-rays due to her reports of neck and back pain. Tr. 319, 321. These showed mild degenerative changes. Tr. 319, 321.

In August 2021, Lewis underwent a nerve conduction study and EMG in her arms due to her complaints of numbness, tingling, and right-arm weakness. Tr. 314. The results showed carpal tunnel syndrome in Lewis's wrists, of moderate severity on the right and mild severity on the left. Tr. 315.

In November 2021, Lewis saw her primary care provider Joshua Raines, D.O., for management of chronic conditions, including ADHD, inflammatory arthritis, post-Covid-19 condition, and fibromyalgia. Tr. 274, 277–78. Lewis reported that she had "no concerns" and stated that she exercised every other day. Tr. 274. Her objective exam findings were unremarkable—no gross sensory or motor deficits, no active synovitis of joints, and no extremity edema. Tr. 277. Lewis had a pleasant and normal mood, appropriate affect, appropriate speech and thought content, and good insight and judgment. Tr. 277. Dr. Raines continued Lewis's medications. Tr. 277–78.

3

In May 2022, Lewis followed up with Dr. Raines. Tr. 372. Lewis said that for physical activity, she lifted weights and tried to walk five days a week, depending on the weather. Tr. 372. Lewis reported not doing as well as her prior visit; her inflammatory arthritis had flared up due to a Covid-19 infection, which caused pain and stiffness. Tr. 376. Lewis also reported worsening fatigue. Tr. 376. On exam, Lewis had swelling in her fingers and toes and restricted range of motion in these areas due to pain. Tr. 375. She was pleasant, her mood was "down," and her affect was "somewhat restricted." Tr. 375. Dr. Raines continued Lewis's medications and added a prednisone taper for her flare-up. Tr. 376.

In July 2022, Lewis saw John Reece, Psy.D., for a psychological consultation. Tr. 329–34. Dr. Reese stated that during the exam, Lewis followed directions and had no problems with concentration. Tr. 334. He offered no diagnosis and opined that "[m]ental symptoms … had no effect" on Lewis's functioning. Tr. 333. Dr. Reece also noted that Lewis did "not cite mental illness symptoms as part of the reason for her current inability to work." Tr. 333.

In August 2022, Lewis followed up with Dr. Raines to discuss undergoing lab work to test her autoimmune levels. Tr. 366. Dr. Raines ordered lab work, Tr. 369, and Lewis returned in late September for the results, Tr. 359. Lewis's antinuclear antibodies, which indicate an autoimmune condition, were "stronger positive," and Dr. Raines added to Lewis's diagnoses a diagnosis

of undifferentiated connective tissue disease. Tr. 364. He noted that he had increased Lewis's medication in August but that it would take "another couple of months to tell if it is going to be helpful." Tr. 364.

Earlier in September, Lewis saw William Zuke, M.D., for a physical consultative exam. Tr. 336–45. Dr. Zuke's exam showed that Lewis had a steady and stable gait. Tr. 339. She was able to "squat, stoop, perform tandem gait, walk on heels and toes, and balance on one foot bilaterally without any difficulty." Tr. 339. Lewis had tenderness at fibromyalgia trigger points, including significant tenderness in her trapezius, scapular, and shoulder muscles. Tr. 399. She had no joint swelling. Tr. 339. Testing showed that Lewis's strength and range of motion were normal in all areas. Tr. 341–45. Dr. Zuke opined that overall, Lewis's functional limitations were "mainly due to her fatigue and pain due to fibromyalgia and inflammatory arthritis." Tr. 340. He explained:

> She has no limitations with regard to sitting. She has mild limitations with regard to carrying and lifting objects. She has no limitations with regard to standing, walking, crouching, stooping, squatting, and bending. She will be able to perform these frequently. There are no limitations with regard to reaching, grasping, handling, fingering and feeling and she will be able to perform these frequently.… She has some mild workplace environmental limitations with regard to a combination of her fibromyalgia flare-ups.

Tr. 340. Dr. Zuke diagnosed Lewis with "inflammatory arthritis versus lupus versus connective tissue disorder," fibromyalgia, and chronic shingles. Tr. 339.

He wrote that Lewis's functional limitations were mainly due to her fatigue and pain from fibromyalgia and inflammatory arthritis. Tr. 340.

In November 2022, Lewis followed up with Dr. Raines. Tr. 347. Lewis stated that she walked and lifted weights. Tr. 347. A depression screening was negative. Tr. 347. On exam, Lewis had a "down" and "somewhat irritable" mood. Tr. 350. She had swelling in her fingers and toes and restricted range of motion in these areas due to pain. Tr. 351. Lab work taken that day showed that Lewis had a positive antinuclear antibodies screening. Tr. 350. Dr. Raines commented that the lab results did not indicate lupus, and he continued Lewis's treatment "as is." Tr. 351. He assessed Lewis with undifferentiated connective tissue disease, inflammatory arthritis, fibromyalgia, ADHD, Raynaud's phenomenon,[2] allergic rhinitis, and primary osteoarthritis in her hands. Tr. 351.

In May 2023, Lewis followed up with Dr. Raines. Tr. 402. Lewis reported some depressive symptoms, Tr. 402, for which Dr. Raines prescribed medication, Tr. 406. Dr. Raines also referred Lewis to another doctor to evaluate for carpal tunnel syndrome. Tr. 406. Two weeks later, Lewis returned

---

[2]     Raynaud's syndrome is a disorder that affects the small blood vessels in fingers and toes, as well as nose, lips, or ear lobes. It causes episodic spasms of those small blood vessels, called a vasospastic attack, in response to cold temperatures or stress. These spasms cause the skin to turn white, then blue and feel cold or numb and as the blood vessels relax, generally after about 15 minutes, the skin may turn red and feel tingly as the blood vessels. *Raynaud's Syndrome*,          Cleveland          Clinic          Health          Library, https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon, [https://perma.cc/QF6G-VCPT].

for further treatment for her mood and for Dr. Raines to complete disability paperwork. Tr. 397. Lewis reported that she noticed "a little bit of an improvement" with the new antidepressant medication but thought that there was "room for improvement." Tr. 397. On exam, Lewis was pleasant, with appropriate affect, a normal mood, appropriate speech and thought content, and good judgment and insight. Tr. 400. Dr. Raines increased Lewis's antidepressant dosage. Tr. 400.

That day, Dr. Raines also completed a medical source statement on Lewis's behalf. Tr. 400. Dr. Raines wrote that he completed the paperwork "based on [Lewis's] report" and that it was "admittedly difficult to assess since she has not worked for a while." Tr. 400. He listed Lewis's symptoms as joint and muscle pain and fatigue. Tr. 386. He wrote that in an eight-hour workday, Lewis could sit for 15 minutes at a time for two hours total and stand for 30 minutes at a time for two hours total. Tr. 387. Lewis would need to walk around every ten minutes for about ten minutes at a time. Tr. 387. She needed unscheduled breaks every 30 minutes. Tr. 387. Lewis could rarely lift up to 50 pounds, and she could use her hands and fingers for about five percent of the workday. Tr. 388. Dr. Raines estimated that Lewis would miss more than four days of work a month. Tr. 389.

In June 2023, Lewis sought care with Dr. Raines for what turned out to be a torn left biceps muscle. Tr. 394. She also complained of numbness in her hands, which she said was "nothing new." Tr. 395. On exam, Lewis exhibited

tenderness to palpation on her upper left arm but retained normal range of motion and strength. Tr. 395. Dr. Raines advised conservative treatment and prescribed home exercises. Tr. 394. A month later, Lewis said that her depression medication had been "very helpful" for her mood. Tr. 390. She reported continued right-hand paresthesias despite using a splint at night, and Dr. Raines again referred Lewis to an orthopedist for suspected carpal tunnel syndrome. Tr. 390.

In October 2023, Lewis saw orthopedist Derek Klaus, M.D., for hand numbness and tingling. Tr. 425. Dr. Klaus reviewed Lewis's August 2021 nerve conduction study and EMG and ordered updated testing. Tr. 428. The updated testing showed carpal tunnel syndrome, moderate to severe on the right wrist and mild to moderate on the left wrist. Tr. 422. Lewis elected to proceed with surgery, first on the right wrist and then on the left. Tr. 422.

*Function Report*

In March 2022, Lewis completed a function report. Tr. 199–206. She wrote that she experienced severe fatigue, constant joint pain, and intermittent muscle aches. Tr. 199. She had fainting spells and constantly came down with shingles. Tr. 199. Lewis experienced brain fog from not sleeping at night due to pain. Tr. 199. She reported numbness in her hands and arms. Tr. 199. Her hand numbness made it difficult to dress and care for her hair. Tr. 200.

8

In May 2023, Lewis's sister completed a third-party function report on Lewis's behalf. Tr. 249–56. Lewis's sister wrote that she helped Lewis with daily duties and provided moral support. Tr. 249. Lewis's sister described Lewis as experiencing severe muscle and joint pain most of the time. Tr. 249. Lewis had chronic shingles. Tr. 249. On bad days, Lewis's sister would help Lewis bathe. Tr. 250. Lewis's sister wrote that Lewis had to leave her job due to pain, and that Lewis experienced fainting spells. Tr. 256.

*State agency opinions*[3]

In October 2022, Abraham Mikalov, M.D., reviewed Lewis's record. Tr. 66–67. Regarding Lewis's residual functional capacity (RFC),[4] Dr. Mikalov opined that Lewis was limited to the light level of exertion—she could stand, walk, and sit for about six hours in an eight-hour workday and lift and carry 20 pounds occasionally and ten pounds frequently. Tr. 66–67. Dr. Mikalov also

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

assessed postural and environmental limitations. Tr. 67. In March 2023, Mehr Siddiqui, M.D., agreed with Dr. Mikalov's opinion. Tr. 75–77.

Also in October 2022 and March 2023, Karla Delcour, Ph.D., and Cindy Matyi, Ph.D., respectively, evaluated Lewis's mental impairments. Tr. 64–65, 73–74. The doctors opined that Lewis did not have a severe mental impairment. Tr. 64, 73.

*Hearing testimony*

Lewis, who was represented by counsel, testified at the telephonic administrative hearing held in October 2023. Lewis stated that she had to stop her last job in a linen factory because she got sick. Tr. 39. She kept passing out and then she would vomit for hours. Tr. 39.

Lewis testified that she experienced widespread pain from fibromyalgia and lupus. Tr. 40. She has a lot of nerve pain. Tr. 40. Lewis takes medications, which calm her pain down for a few hours before wearing off. Tr. 41–42. Her primary care doctor prescribed home exercises, which she performs. Tr. 42. Lewis said that she has problems sleeping. Tr. 42–43. But even with a good night's sleep, she still feels tired. Tr. 43.

When asked how long she could stay on her feet before needing a break due to pain, Lewis answered "about a half hour." Tr. 43–44. She could sit for about a half an hour at a time. Tr. 44. Lewis stated that her fingers swelled and her right hand was numb. Tr. 44. Lewis lives by herself. Tr. 44. Her sister lives across the street, and on a typical day, her sister comes over and helps

Lewis with cooking and laundry. Tr. 45. Lewis stated that she could not drive because her hands were numb, but also that the last time she drove was "the other day." Tr. 45–46. Lewis can perform light housekeeping activities for 15 to 30 minutes before needing to rest. Tr. 48.

Lewis explained that she has Raynaud's, so "doing things on [her] phone is very difficult." Tr. 47. For years she has had problems buttoning or zipping her clothes. Tr. 47. Lewis is right-handed, and her right hand was worse than her left. Tr. 48. She also had recurring shingles—she could go months without having an episode and then she would have an episode several times a month. Tr. 48. An episode could last a couple of days to a week. Tr. 48. Lewis stated that she had problems with her memory and attention and felt like she was a in a fog. Tr. 48–49. It was hard for her to concentrate when reading and she had to write down reminders for herself. Tr. 49–50.

The ALJ discussed with the vocational expert Lewis's past relevant work as a department manager. Tr. 52–53. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Lewis could perform Lewis's past work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 53–54. The vocational expert answered that such an individual could perform Lewis's past work, both as Lewis performed it and as the Dictionary of Occupational Titles defines it. Tr. 54.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act for a Title II period of disability and disability insurance benefits.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2022, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments:  Inflammatory arthritis/connective tissue disease, fibromyalgia, bilateral carpal tunnel syndrome, and osteoarthritis of the bilateral hands (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), but she can never climb ladders, ropes, or scaffolds; she can no more than occasionally climb ramps/stairs, stoop, crouch, kneel, crawl; and she can frequently but not constantly balance, handle, and finger.

6.  The claimant is capable of performing past relevant work as a Department Manager, as this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2022, through the date of this decision (20 CFR 404.1520(f)).

Tr. 19–26.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when evaluating Dr. Raines's opinion*

Lewis argues that the ALJ erred when he evaluated Dr. Raines's opinion. Doc. 7, at 7–12.

 The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective

15

medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* (citing § 404.1520c(b)(2)).

In his decision, the ALJ summarized the medical evidence. Tr. 22–24. Then, he evaluated the opinions of the consultative examiner and the state agency reviewers. Tr. 24–25. The ALJ expanded on these findings, and explained why he discounted Lewis's reports of the severity of her symptoms:

> In so finding, I note that while the claimant has reported passing out "at times," she has [not] voiced any particularly concern or urgency with regard to finding the etiology for or treating these episodes; there are no contemporaneous emergency room visits, and thus no findings contemporaneous with these reported events; and the associated nausea, vomiting, and other symptoms reported for the first time of record in mid-September 2023, lack any longitudinal corroboration (*see* 10F/2). Moreover, the claimant stated further at that time that she'd had no recent syncopal episodes, her primary complaint

was of pain in her right hand, and both neurological and orthopedic clinical findings through October 2023 have been unremarkable (10F, 11F).

Therefore, while I have determined that the claimant's combination of impairments reasonably limit her to frequent handling and fingering tasks, I do not find the claimant more limited in the use of her hands because the objective evidence does not support greater limitations and because in spite of the claimant's testimony asserting pain, swelling, deformity, and weakness in her hands and fingers, the claimant remains able to bathe, dress, groom, and feed herself independently; she continues to cook, clean, do laundry, and drive; she acknowledged using her cell phone frequently; she has acknowledged regularly lifting weights for exercise; and she reported that due to brain fog—the severity of which is not corroborated by the medical evidence—she "writes everything down." These activities do not support the severity of hand dysfunction asserted.

Tr. 25. The ALJ next turned to Dr. Raines's opinion:

Similarly, while Dr. Raines has purportedly opined that the claimant can sit, stand, and/or walk only in 10-minute increments and for only a total of 2 hours during an 8-hour workday; that the claimant would regularly be off task for 20 percent of an average workday; and that the claimant would miss more than 4 days of work per month, Dr. Raines' treatment notes indicate that this "opinion" was completed with [the claimant and] based on her report (8F, 9F/11). Thus, Dr. Raines' assessment does not reflect his medical opinion, but rather, reflects the claimant's asserted limitations, which are not supported by the medical evidence or by the claimant's acknowledged and documented activities.

Tr. 25.

17

Lewis argues that the ALJ erroneously concluded that Dr. Raines's opinion "was based on Plaintiff's asserted limitations, rather than Dr. Raines' observations and conclusions." Doc. 7, at 12–13. But Dr. Raines himself commented that Lewis's "disability paperwork [was] completed with [Lewis] based on her report," Tr. 400, as the ALJ accurately observed, Tr. 25 (citing Tr. 400).[5] And this is an acceptable reason for an ALJ to reject a medical opinion. *See e.g., Hopkins v. Comm'r of Soc. Sec.*, No. 23-5696, 2024 WL 3688302, at *3 (6th Cir. Apr. 9, 2024) (finding that an ALJ addressed the supportability factor when he found unpersuasive a medical opinion because the doctor "relied heavily on the [claimant's] subjective reports to conclude that [the claimant] was severely impaired in various work-related functions"); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("a doctor cannot simply report what his patient says and re-package it as an opinion."); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (finding that an ALJ properly discounted an opinion about the amount of weight the claimant could lift because it "appears to be based not upon his own medical conclusion, but upon … [the claimant's] own assessment of his weight-lifting limitations.").

---

[5]     Lewis cites *Russ v. Comm'r of Soc. Sec.*, No. 1:20-cv-1838, 2021 WL 3709916, at *9 (N.D. Ohio Aug. 20, 2021), in support of her assertion that the ALJ erred when finding that Dr. Raines's opinion was based on Lewis's reports. Doc. 7, at 10. But in *Russ*, the ALJ "did not explain how he arrived at that conclusion." 2021 WL 3709916, at *9. Here, the ALJ explained how he arrived at his conclusion that Dr. Raines's opinion was based on Lewis's reports—Dr. Raines himself said so. Tr. 25, 400.

The ALJ continued:

> To the extent that any portion of Dr. Raines assessment reflects his own medical opinion, I find his opinion unsupported and unpersuasive. In her testimony and in her written statements of record, the claimant alleges disability due to "constant" and debilitating pain and "severe" fatigue, with "brain fog, … fainting spells," and "bowel issues," in addition, pain/tingling/numbness and dysfunction in her hands (testimony, 3E). Her sister has also provided a written statement asserting that "muscle and joint pain" and "brain fog and fatigue" limit the claimant to engaging in any activity for only short periods of time, such that the claimant does not have the mental or physical wherewithal for regular full-time work (10E). On the medical evidence before me, I simply cannot find the claimant as limited as she (or her sister, or Dr. Raines) asserts. I considered Dr. Raines' status as a treating source with a longitudinal history treating the claimant but note Dr. Raines is not a specialist in neurology or orthopedics. Further, Dr. Raines opinions are outweighed by the other factors mentioned including the objective findings and the claimant's activities.

Tr. 25–26.

Lewis recites some of the medical evidence, including Dr. Raines's treatment notes and Lewis's sister's report. Doc. 7, at 9–12. But she doesn't explain how she believes that the ALJ erred in evaluating Dr. Raines's opinion. Merely citing evidence and disagreeing with the ALJ's conclusion does not show that the ALJ's decision lacks substantial evidence. *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence

supports the conclusion reached by the ALJ."). Lewis states, in conclusory fashion, that the ALJ "offered an inadequate analysis … and failed to proffer a coherent explanation." Doc. 7, at 10. But Lewis does not identify what about the ALJ's analysis she believes is inadequate or incoherent—on its face the ALJ's decision is neither of these things.

Lewis asserts that the ALJ "failed to … discuss consistency" when he evaluated Dr. Raines's opinion. Doc. 7, at 7; Doc. 10, at 1. But the ALJ explained why Dr. Raines's opinion was inconsistent with other record evidence. Tr. 25–26 (referencing Lewis's objective exam findings, daily activities, and Lewis's and Lewis's sister's reports of Lewis's symptoms and limitations); *see also* Tr. 25 (ALJ explaining why he discounted Lewis's reports of symptoms and limitations, including Lewis's daily activities and objective exam findings throughout the record); *see* 20 C.F.R. § 416.920c(c)(2) (defining "[c]onsistency" as "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be.").

While the ALJ did not use the work "consistency," this is not error. *See Cormany*, 2022 WL 4115232, at *3 ("[A]n ALJ need not specifically use the terms 'supportability' or 'consistency' in his analysis."). And the ALJ, having already once explained why he discounted Lewis's reports of symptoms and limitations, was not required to again recite all of these findings. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ

did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."). Notably, Lewis has not challenged any of the ALJ's characterization of the record evidence.

Finally, Lewis complains that the ALJ failed to evaluate the state agency reviewers' opinions. Doc. 7, at 12. But the ALJ evaluated the state agency reviewers' opinions and explained why he found them to be persuasive, Tr. 21, and unpersuasive, Tr. 25. Lewis has not shown that the ALJ erred when evaluating Dr. Raines's opinion—or any other opinion in the record.

### 2. The ALJ did not err at step four

Lewis argues that the ALJ erred at step four when he found that Lewis could perform her past work as a department manager. Doc. 7, at 12. Lewis contends that if the ALJ had limited Lewis's ability to handle and finger to occasionally, rather than frequently, then Lewis could not perform her past work. *Id*. at 12–15.

But the ALJ did not limit Lewis to occasional handling and fingering. The ALJ limited Lewis to frequent handling and fingering. Tr. 22. The vocational expert testified that an individual with Lewis's RFC—the ability to perform light-level work and frequently handle and finger[6]—could perform Lewis's past work both as Lewis performed it (light-level exertion) and as the Dictionary of Occupational Titles defined it (sedentary-level exertion). Tr. 53–

---

[6]     Lewis's RFC also included postural limitations. Tr. 22.

54. So Lewis's argument is based on a mischaracterization of the RFC and vocational expert testimony.

Moreover, the vocational expert testified that even if Lewis could only occasionally handle and finger, she could still perform her past job of department manager as the Dictionary of Occupational Titles defined it. Tr. 54–55, 56–57. And the ALJ found that Lewis could perform her past work both as she performed it and as generally performed. Tr. 26. So even if Lewis could show that the ALJ erred when finding that Lewis could perform her past work as Lewis performed it, which Lewis has not shown, Lewis has not shown that the ALJ erred when finding that Lewis could perform her past work as generally performed. So Lewis has not shown that the ALJ erred at step four. *See Yaden v. Saul*, No. 18-cv-153, 2019 WL 3997270, at *8 (E.D. Ky. Aug. 23, 2019) (finding that it was "legally irrelevant" whether the claimant could perform his past work as he performed it when the ALJ also found that the claimant could perform his past work as generally performed); *Norman v. Colvin*, No. 1:14-cv-2374, 2016 WL 11371448, at *4 (N.D. Ohio Jan. 4, 2016) ("even 'if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled'") (quoting Soc. Sec. Ruling 82-61, 1982 WL 31387, at *2 (S.S.A. 1982)), *report and recommendation adopted*, 2016 WL 922741 (N.D. Ohio Mar. 11, 2016).

### 3. The ALJ did not err at step two

Lewis argues that the ALJ erred at step two "when he failed to properly apply the criteria of Social Security Ruling 96-8p" and consider all of Lewis's impairments when formulating the RFC. Doc. 7, at 15.

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is … legally irrelevant" because the ALJ considered Anthony's severe and non-severe impairments in the remaining steps of the analysis) (citing *Maziarz*). "After an ALJ makes a

23

finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

Lewis argues that at step two the ALJ "erroneously failed to include any psychological impairments." Doc. 7, at 16. But the ALJ explained at step two why he found that Lewis's psychological impairments were non-severe. Tr. 20–21. Lewis doesn't explain what about the ALJ's reasoning she believes is erroneous. Moreover, even if the ALJ did err at step two, which Lewis has not shown, any error would be harmless because the ALJ considered Lewis's psychological impairments at the remaining steps of the evaluation. Tr. 21, 23–24, 26 (referencing Lewis's mental impairments); *see Anthony*, 266 F. App'x at 457.

Next, Lewis argues that the ALJ "erroneously failed to include [in the RFC] any limitations related to [Lewis's] fibromyalgia," Doc. 7, at 16–17, an impairment that the ALJ at step two found to be severe, Tr. 20. In support of her argument, Lewis states that she "repeatedly reported both pain … and fatigue," which, she alleges, "interfered with her ability to maintain concentration." Doc. 7, at 17. But the ALJ considered Lewis's reports of pain and fatigue, Tr. 22–26, and "brain fog," Tr. 23, 25–26. Separately, the ALJ also considered Lewis's ADHD, for which Lewis took Adderall with "good benefit." Tr. 20. The ALJ observed that the consultative examiner found that Lewis

showed no attentive or cognitive difficulty during the exam. Tr. 21. And the ALJ considered Lewis's depressive symptoms, Tr. 20, 23, 24, which Lewis mistakenly alleges the ALJ "clearly failed" to consider, Doc. 7, at 18. The ALJ limited Lewis to a reduced range of light work based on all of her impairments—more limited than the state agency reviewers had opined. Tr. 26, 67, 76. Lewis doesn't identify anything about the ALJ discussion of these items that she believes is erroneous. She has not shown that the ALJ erred at step two.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 14, 2025

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).